```
                  UNITED STATES DISTRICT COURT
                   DISTRICT OF MASSACHUSETTS
```

|  |  |
|---|---|
| PANAGORA ASSET MANAGEMENT, INC. ) | |
| Plaintiff, ) | |
| v. ) | CIVIL ACTION |
|   ) | NO. 09-11094-WGY |
| ST. PAUL MERCURY INSURANCE, ) | |
| Defendant. ) | |

MEMORANDUM AND ORDER

YOUNG, D.J.                                                December 14, 2009


**I. INTRODUCTION**

PanAgora Asset Management, Inc. ("PanAgora")moves for Partial Summary Judgment on Count I of its Complaint, seeking a Declaration that the retention (i.e. deductible) applicable to its claim on an insurance policy with the Defendant, St. Paul Mercury Insurance ("Travelers"), is in the sum of $500,000. PanAgora does not seek Summary Judgment on Counts II, III or IV of its claim.

Travelers makes a cross motion for Summary Judgment on all Counts of PanAgora's Complaint, on the basis that the retention applicable to the claim is $2,500,000, and thus the refusal by Travelers to pay the claim constituted no breach of the insurance contract, as the loss alleged is less than the retention.

**A.    Undisputed Facts**

Travelers sold Policy No. 590CM3135 (the "Policy") to PanAgora, which provided error and omissions coverage for professional liability claims against PanAgora arising out of "Wrongful Acts" committed during the "Policy Period", viz. December 31, 2007 to December 31, 2008.  PanAgora's Statement of Facts, ¶ 1 [Doc. No. 11]. The Policy was a "claims-made policy", covering only "claims" made against losses incurred during the period of the Policy.  Affidavit of Michael H. Turpin, Ex. 1.  It had a limit on liability of $5,000,000 and a retention of $500,000 under the Investment Adviser Professional Liability Insuring Agreement.  Aff. of Michael H. Turpin, Ex. No. 2, Policy Declarations, Page 1,2 [Doc. No. 12].

The Policy defined the term "Claim" as follows:

Claim means:
(a)   a written demand against any Insured for monetary damages;
(b)   a civil proceeding against any Insured, which shall be deemed commenced by the service of a complaint of similar pleading;
(c)   a criminal proceeding against any Insured, which shall be deemed commenced by a return of an indictment of similar legal document;
(d)   an arbitration proceeding against any Insured, which shall be deemed commenced by such Insured's receipt of an arbitration petition; or
(e)   a formal administrative or formal regulatory proceeding against any Insured, which shall be deemed commenced by such Insured's receipt of a notice of fixed charges, or a formal investigative order,
on account of a Wrongful Act."

Id., General Terms, Condition and Limitations, Page 2.

The Policy states, under a heading entitled "Limits of Liability and Retention" that

> For the purposes of this Policy, all Claims arising out of the same Wrongful Act and all Interrelated Acts of the Insureds shall be deemed one Claim, and such Claim shall be deemed to be first made against the Insureds on the date the earliest of such Claims is first made against them, regardless of whether such date is before or during the Policy Period.

Id., General Terms, Conditions and Limitations, Page 5.

The Policy also states, under the heading "Company Liability Coverage" that

> The Insurer shall pay on behalf of the Company Loss for which the Company becomes legally obligated to pay on account of any Claim first made against the Company, during the Policy Period . . . for a Professional Services Act taking place before or during the Policy Period.

Id., Investment Adviser Professional Liability Insuring Agreement, Page 1.

The Policy continues

> Professional Services Act means any error, misstatement, misleading statement, act, omission, neglect, or breach of duty actually or allegedly committed or attempted by or on behalf of any Insured in their capacity as such in the performance or rendering of, or failure to preform or render, any financial, economic, or investment advice, or any investment management services, to any customer or client of the Company for monetary consideration pursuant to a written contract or agreement. Wrongful Act means Professional Services Act.

Id., Investment Adviser Professional Liability Insuring Agreement, Page 1.

The Policy contains a section titled "Cost of Correction Coverage Extension Endorsement – Investment Adviser Professional Liability Insuring Agreement" (the "Endorsement"). Id. This Section carries a Retention in the amount of $2,500,000. Id. Cost of Correction Coverage Extension Endorsement, Page 1. The Endorsement states:

> The Insurer shall reimburse the Insured for the costs incurred by the Insured to mitigate or correct direct monetary damages to a customer of the Company from any Professional Services Act:   ...
> (c)   provided that such Professional Services Act would, in the absence of any such mitigation or correction, result in covered Loss were a Claim to be made under this Insuring Agreement.

Id. Endorsement, Page 1.

On November 26, 2008, PanAgora received instructions from its client, Shell Oil ("Shell"), to construct three portfolios for execution on November 28th. Amended Complaint, ¶ 9 [Doc. No. 8]. To meet this short deadline, PanAgora went outside its normal procedures used an Excel spreadsheet to construct these portfolios,. Id. ¶ 10. As a result, PanAgora overweighted the portfolios in Australian Equity Index Futures. Id. ¶ 11. On December 3rd the error was discovered and corrected, resulting in a loss to the portfolios of approximately $2,000,000. Id. ¶ 12. On the day of correction, December 3rd, PanAgora notified Shell of the loss by voicemail. Answer, Ex. A, Pg. 1. [Doc. No. 15].

On or around December 4, 2008, PanAgora notified Travelers of the Loss. Travelers's Statement of Facts, ¶ 1. On or around

4

the same day, Travelers informed PanAgora that it was of opinion that the matter was a Cost of Corrections issue. Id. ¶ 3. On December 16, 2008, PanAgora wrote Travelers to inform them of the loss, inquiring as well whether any Claim by Shell would be covered under the Policy. Aff. of Sarah Mubashir, Ex. 2, Page 2 [Doc. No. 19]. Travelers maintains that this letter, together with the notification of both Shell and Travelers of the Loss, represented an invocation of the Endorsement. Answer, ¶¶ 52,53.

On December 17th, PanAgora representatives spoke with and subsequently sent an email to Shell representatives, outlining the nature of the error and loss suffered. Id. Ex. B, Page 1,2. Shell responded to PanAgora by email on December 22nd. Id. Ex. B, Page 1. Travelers admits that this email represented a "Claim" for the purposes of the Policy. Memorandum of Law in Opposition, Page 9 [Doc. No. 17].

On January 9, 2009, Travelers wrote PanAgora denying coverage for the Loss. Turpin Affidavit, Ex. 3. PanAgora requested Travelers's consent to settle the matter on January 27th. Id. Ex. 4. Travelers replied on February 18th, again denying coverage. Id. Ex. 5. PanAgora made Shell whole for the losses by crediting Shell's portfolios $2,019,936.94 on March 3rd and 5th, 2009. Id. ¶ 8.

**B.   Federal Jurisdiction**

This Court has the jurisdiction to adjudicate the matter pursuant to 28 United States Code, Paragraph 1332.

**II.  ANALYSIS**

**A.   Determination of an Unambiguous Insurance Policy is Matter of Law for the Court**

Under Massachusetts law, the interpretation and application of unambiguous language in an insurance contract is matter of law for the court.  <u>Cody</u> v. <u>Connecticut General Life Insurance Company.</u>, 387 Mass. 142 (1982); <u>Ober</u> v. <u>National Cas. Co.</u>, 318 Mass. 27 (1945); <u>Camp Dresser & McKee, Inc.</u> v. <u>Home Insurance Company</u>, 30 Mass. App. Ct. 318 (1991); <u>Scottsdale Insurance Co.</u> v. <u>Torres</u>, 561 F.3d 74 (1st Cir., 2009).  "The primary issues in this case concern the interpretation of an insurance contract, which is a question of law".  <u>Allmerica Finance Corp.</u> v. <u>Certain Underwriters at Lloyds, London,</u> 449 Mass. 621, 628 (2007).

In interpreting such a contract, the Court must consider that "an insurance contract is to be interpreted according to the fair and reasonable meaning of the words in which the agreement of the parties is expressed (internal quotations omitted)." <u>Cody</u>, 387 Mass. 142, 146. "Where the words in a policy are not ambiguous, they must be construed in their usual and ordinary sense (internal quotations omitted)".  <u>Scottsdale</u>, 561 F.3d 74,

77. Ambiguous policy terms are construed in favor of the Insured. <u>Hazen Paper Co.</u> v. <u>U.S. Fid. & Guar. Ins. Co.</u>, 407 Mass. 689, 555 N.E.2d 576, 583 (1990).

**B.   Was There a Valid Claim Under the Insuring Agreement?**

As stated supra, "The Insurer shall pay on behalf of the Company Loss for which the Company becomes legally obligated to pay on account of any Claim first made against the Company, during the Policy Period...for a Professional Services Act taking place before or during the Policy Period."  Policy, Investment Adviser Professional Liability Insuring Agreement, Company Liability Coverage, Page 1.

The Claim in question is the demand by Shell contained in its December 22nd email, acknowledged by Travelers to constitute a "written demand", as required by the Policy's definition of "Claim".  Memo in Opposition, Page 9; Policy, General Terms, Page 2.  The email 'demand' against PanAgora is a valid Claim under the Policy.

**C.   Was PanAgora's Letter of December 16 (the "Letter") an Invocation of the Endorsement?**

The Letter states in relevant part:

PanAgora requests confirmation from Travelers that PanAgora is covered for any losses arising from any claim by Shell Oil for the above described error or omission by PanAgora under PanAgora's Investment Adviser Professional Liability Policy.

Mubashir Aff., Ex. 2, Page 2.

As Travelers's recognizes "an ambiguity is not created simply because a controversy exists between parties, each favoring an interpretation contrary to the other". Memo in Opposition, Page 8 (quoting Lumbermens Mut. Cas. Co. v. Offices Unlimited, Inc., 419 Mass. 462, 466 [1995]). The Policy here envisages a situation where a Claim has been made against the Insured – PanAgora. At the time of the Letter, no Claim had been made by Shell against PanAgora for the loss; therefore there was then no Claim against the Policy.

Travelers thus argues that PanAgora, by immediately shooting off the Letter to Travelers before any Claim had been made, in fact was invoking coverage under the Endorsement (with its higher retention). This is too slick by half.

In full consideration of the question, it is prudent carefully to examine the text of the Endorsement itself:

> The Insurer shall reimburse the Insured for the costs incurred by the Insured to mitigate or correct direct monetary damages to a customer of the Company from any Professional Services Act: ...
> (c)   provided that such Professional Services Act would, in the absence of any such mitigation or correction, result in covered Loss were a Claim to be made under this Insuring Agreement.

Extension Endorsement, Page 1.

This Endorsement, according to its plain meaning, covers those situations where an insured covers a client's loss prior to

any claim being made for the purpose of an ongoing client relationship or some other business reason.

The "usual and ordinary" meaning of the word "reimburse", implies the incurrence of a cost by the Insured in correcting a mistake, which cost must be 'repaid' to the Insured by the Insurer.

Not surprisingly, to protect the Insurer, the retention under the Endorsement is considerably higher.  Prior to the settlement in March 2009, no monies were paid to Shell, in compensation or otherwise, as a result of PanAgora's actions. Mubashir Aff.  Travelers's assertion that "PanAgora sought to 'correct monetary damages to a customer'", Memo in Opposition, Page 9, appears to be without basis.  Without a payment to Shell by PanAgora, Travelers was not, either at the time of the Letter or at any time prior to the Claim by Shell, in a position to "reimburse" any cost incurred in repaying a loss.  The Extension Endorsement was never invoked by PanAgora.

### D.   The Retention Language Argument

Travelers has one last string in its bow.  It argues that the "Policy's Retention language is unambiguous" and requires application of the $2,500,000 retention.  Id., Pages 8,9.

The applicable language reads

> If Loss arising from a single Claim is subject to more than one Retention, the applicable Retention shall be

applied separately to each part of such Loss, but *the largest applicable Retention set forth in the Declarations shall be the maximum Retention applicable to all Loss* arising from such Claim [Emphasis added].

Policy, General Terms, Page 5.

This argument avails Travelers nothing, however, as the Endorsement is inapplicable to the facts of this case and there is but one applicable retention – the $500,000 retention. Policy, Policy Declarations, Page 2.

### III. CONCLUSION

Accordingly, the Court holds there was no invocation of the Endorsement by PanAgora, the Claim by Shell is covered by the Insuring Agreement, and the appropriate Retention under that Agreement is $500,000.  PanAgora's Motion for Partial Summary Judgment is ALLOWED.  Travelers's Cross-Motion is DENIED.

SO ORDERED.

/s/ William G. Young
_____
**WILLIAM G. YOUNG**
**DISTRICT JUDGE**